UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. _____-CIV_____

STARMARK FINANCIAL LLC,

    Plaintiff,

vs.

VASANT NANAVATI,

    Defendant.
_____/

## COMPLAINT

Plaintiff, Starmark Financial LLC ("Starmark"), hereby sues Defendant, Vasant Nanavati ("Vasant"), for breach of fiduciary duty and fraud.

### JURISDICTION AND VENUE

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. This is an action for breach of fiduciary duty, and fraud exceeding $75,000 in controversy, exclusive of costs, interest, and fees. Complete diversity of citizenship exists between the parties.

2. Starmark is a Florida limited liability company with its principal place of business located at 800 Fairway Drive, Suite 190, Deerfield Beach, FL 33441. The sole member of Starmark, Brett Silver, is a citizen of Florida. Thus, Starmark is a Florida citizen for diversity purposes.

3. Vasant is an individual and a citizen of New York, who committed intentional torts in Florida and is subject to this Court's jurisdiction pursuant to Florida's long-arm statute. See Fla. Stat. § 48.193.

4. Venue is proper because a substantial part of the events giving rise to the claims occurred in the Southern District of Florida. 28 U.S.C. § 1391(b).

5. Starmark retained undersigned counsel and is obligated to pay said counsel a reasonable fee for services rendered on its behalf.

6. All conditions precedent to this action have occurred or were waived by Vasant.

**GENERAL ALLEGATIONS**

<u>Luther's Business Model</u>

7. Luther Appliance & Furniture Sales Acquisition LLC ("Luther")[1] is a retail seller of merchandise. Luther primarily serves both government employees and companies doing business with government agencies. Luther's customers make purchases via sales finance contracts with payments through payroll deduction.

8. So long as the consumer remains employed, payments are deducted automatically from the consumer's payroll and forwarded to Luther's holding account. Luther maintains a system on which these payments are recorded.

9. Luther would obtain loans from a creditor, First Avenue Funding ("First Avenue"), to fulfill sales orders: Luther would use the loaned funds to purchase the products ordered by a consumer. These accounts receivable were used as collateral for the loans, resulting in First Avenue holding liens on these accounts.

<u>The Original Contract Between Starmark and Luther</u>

10. In December 2022, Starmark entered into an agreement (the "Contract") with Luther for the purchase of approximately ninety-six percent (96%) of Luther's account receivables (the "accounts") for the sum of Five Million One Hundred Sixty-Four Thousand Three Hundred Thirty-Three Dollars and 15/100 ($5,164,333.15). <u>See</u> Purchase Agreement, **Exhibit 1**.

11. These accounts consisted of both charged-off debt and performing accounts.

---

[1] Luther is the defendant in a related action, <u>Starmark Financial LLC v. Luther Appliance & Furniture Sales Acquisition LLC</u>, Case No. 24-62357-CIV (S.D. Fla). That case is currently stayed pending Luther's bankruptcy proceedings.

12. Although Starmark purchased the accounts, Starmark and Luther further agreed that Starmark would continue to purchase certain accounts and that Luther would continue to service the performing accounts by processing consumer payments, performing billing services, maintaining account records, and remitting collected payments to Starmark. Ex. 1, ¶ 22. This servicing relationship created a dependency—Starmark relied on Luther for accurate financial reporting, proper handling of payments, compliance with regulatory requirements, and management of sensitive customer data.

13. Additionally, Luther and Starmark agreed that Luther would offer performing accounts to Starmark for sale on a monthly basis. See Annarelli Affidavit, **Exhibit 2**, ¶ 5. Under the servicing arrangement, Luther was obligated to process all payment transactions (e.g., ACH, credit or debit cards, etc.), post payments to specified accounts, maintain business records, and remit collected payments to Starmark on a weekly basis. Ex. 1, ¶ 22. In March 2024, the arrangement was modified so that Luther would remit payments to Starmark on a daily basis.

14. Pursuant to the Contract, Starmark had legal ownership over consumer payments received by Luther stemming from Starmark-owned accounts. Ex. 2, ¶ 6. The servicing agreement established Luther as a fiduciary with respect to these funds and account data (similar to a trustee), requiring Luther to maintain accurate records and provide Starmark with regular financial reports.

15. During the duration of the Contract, Luther regularly remitted funds to Starmark. Luther also provided account-level information to Starmark which indicated payments made, outstanding balances, delinquency, and other pertinent financial data. This information was crucial for Starmark's compliance with state and federal regulations governing consumer finance.

Acquisition by Prosperitas and Vasant's Involvement

16. In March 2023, Prosperitas Partners LLC ("Prosperitas") became the sole owner of

Luther. Ex. 2, ¶ 7.

17. Prosperitas is owned in part by 9th Planet Partners LLC ("9th Planet"), which is wholly owned by Vasant. Ex. 2, ¶ 7.

18. Through his ownership of 9th Planet, Vasant held a 12.63% membership interest in Prosperitas. Ex. 2, ¶ 7.

19. In March 2023, Prosperitas appointed Brad Powers (a Prosperitas member) as CEO of Luther, who initially took the lead in the relationship with Starmark. Ex. 2, ¶ 7.

20. On October 20, 2023, Mr. Powers delegated management of the Luther-Starmark relationship to Vasant via email, stating that Vasant would "take the lead in dealing with Starmark on a daily basis." See Emails, **Exhibit 3**, at 1; Ex. 2, ¶ 8.

21. From October 20, 2023 onward, Vasant was directly involved in all aspects of the Luther-Starmark relationship, including new receivable purchases, collections of Starmark-owned receivables, and the remittance of funds to Starmark. Ex. 3 at 4–10; Ex. 2, ¶ 9.

<u>Vasant's Misrepresentations and Subsequent Purchases</u>

22. Following Prosperitas' acquisition, Starmark continued to purchase additional accounts from Luther.

23. First Avenue held liens on some accounts purchased by Starmark. Prior to 2024, Starmark would wire funds directly to First Avenue to satisfy liens held on the accounts.

24. On January 12, 2024, Vasant sent an email to Starmark discussing the documentation Luther previously used to obtain funding from First Avenue, indicating this documentation would now be sent to Starmark for funding instead of First Avenue. Ex. 2, ¶ 10. In other words, Vasant represented that Starmark would fund Luther's receivables moving forward (not First Avenue).

25. On January 17, 2024, Vasant and Brad Powers met in person with Brett Silver and Ken Annarelli of Starmark to discuss purchasing and funding Luther's receivables. Ex. 2, ¶ 11.

26. During this meeting, Vasant expressly represented to Starmark that First Avenue was "no longer in the picture" and instructed Starmark to send all future funding for its receivables to Luther. Ex. 2, ¶ 11. Put simply, Vasant represented that First Avenue held no liens on Luther's receivables which Starmark would subsequently purchase. See infra, ¶ 27.

27. In furtherance of this representation, beginning January 24, 2024, Vasant sent wire instructions via email to Starmark and repeatedly reiterated those instructions to ensure funds went into a Luther bank account. Ex. 2, ¶ 12; see Ex. 3.

28. Based on Vasant's representations—which were material and on which Starmark justifiably relied—Starmark executed and funded the following purchases of Luther's receivables, (Ex. 2, ¶ 13):

   a. Jan. 30, 2024: $402,412.46 of receivables for a total cost of $291,749.03;

   b. Feb. 12, 2024: $401,762.98 of receivables for a total cost of $301,322.24; and

   c. Feb. 22, 2024: $322,659.07 of receivables for a total cost of $231,635.70.

29. Shortly after Starmark's funding of these purchases totaling $824,706.97, Vasant ceased all communications with Starmark. Ex. 2, ¶ 14.

Luther's Insolvency and Discovery of Fraud

30. On or about October 9, 2024, Starmark was informed that Mr. Powers had died by suicide.

31. Fred Larcombe, the CFO of Luther, conducted daily calls with Starmark for approximately two weeks to advise of Luther's insolvency and its inability to continue to operate. Vasant was present on these daily calls and an active participant. Ex. 2, ¶ 16.

32. Upon information and belief, Vasant had knowledge of Luther's insolvency and financial distress well before Powers' death, yet continued to solicit funds from Starmark and make misrepresentations about Luther's financial condition and relationship with First Avenue.

33. During these calls, Mr. Larcombe admitted there was fraud in Luther's business dealings during the Prosperitas ownership period under Mr. Powers' leadership. Ex. 2, ¶ 16.

34. On or about October 30, 2024, Prosperitas appointed an interim officer, Chirag Chiman, to facilitate a winding down of Luther through either a voluntary dissolution or bankruptcy proceeding. Ex. 2, ¶ 17. Luther initiated bankruptcy proceedings on January 31, 2025.[2]

35. Based on Luther's representations of its inability to service accounts, Starmark terminated its servicing relationship with Luther and requested the turnover of payments and associated financial information. Ex. 2, ¶ 18.

36. Following instructions from Vasant (and other members of Prosperitas), Luther refused to turn over payments from the accounts owned by Starmark or provide the corresponding financial data necessary for compliance with state and federal law. Ex. 2, ¶ 21. Upon information and belief, Vasant (and other Prosperitas members) directed this withholding of payments and data in an attempt to conceal evidence of the fraudulent scheme and damage Starmark.

<u>Discovery of the Fraudulent Scheme</u>

37. Starmark subsequently discovered that, contrary to Vasant's January 2024 representations, Luther (through *inter alia* Vasant) had been committing fraud by pledging Starmark-owned receivables to First Avenue in exchange for loan advances ("double-pledging"). This fraudulent conduct began shortly after Prosperitas took ownership in March 2023. Ex. 2, ¶ 19.

---

[2] <u>In re Luther Appliance & Furniture Sales Acquisition LLC</u>, No. 25-10163 (Bankr. S.D. Fla. 2025).

38. Upon information and belief (and based on his position, responsibilities, and involvement with both companies' operations), Vasant had knowledge of the double-pledging scheme from the beginning of his involvement in October 2023 (when he took over the Luther-Starmark relationship). Vasant was directly delegated authority by Powers to manage the Luther-Starmark relationship and worked closely with Starmark's financial operations beginning October 2023. As the designated relationship manager with deep involvement in Luther's financial operations, Vasant was aware of Luther's financial challenges and the fraudulent pledging of Starmark-owned receivables to First Avenue.

39. Luther—under Vasant's and other Prosperitas members' direction—kept Starmark's purchase funds rather than sending them to First Avenue to release any liens on the receivables Starmark had purchased. Ex. 2, ¶ 21. Despite Vasant's misrepresentations that Luther was "not funding any receivables," Luther nonetheless had an obligation to use Starmark's purchase funds to clear any existing liens.

40. Upon information and belief, Luther falsified sales orders to conceal this from Starmark based on orders from Vasant and other Prosperitas members.

41. Upon information and belief, Vasant directly benefited financially from the fraudulent scheme to misdirect Starmark's funds into Luther's operations rather than using those funds to satisfy existing liens held by First Avenue. Luther's bank statements reveal questionable wire transfers from Luther's accounts to Prosperitas members.

42. Starmark suffered significant damage from this fraudulent scheme, including losing its monies and its accounts now being encumbered with liens (thus impairing the accounts' value). Further, Luther's resultant insolvency and bankruptcy has led consumers to believe their debts need no longer be paid to Luther (and by extension, Starmark), resulting in significant drops in

monthly collections on accounts beginning October 2024 (when Powers' death was announced).

## COUNT I—BREACH OF FIDUCIARY DUTY

43. Starmark incorporates by reference the allegations set forth in Paragraphs 1 through 42, as if set forth herein.

44. As a member of Prosperitas and the designated manager of the Luther-Starmark relationship, Vasant owed fiduciary duties to Starmark, including duties of care, loyalty, good faith, and full disclosure. These duties were heightened by the servicing agreement which obligated Luther to service Starmark-owned accounts, process payments, maintain financial records, and remit collected funds to Starmark. The Purchase Agreement's servicing provisions established a relationship of special trust and confidence that went beyond ordinary arms-length business dealings.

45. Vasant assumed these fiduciary duties when he took over the Luther-Starmark relationship on October 20, 2023, at which point he began handling all aspects of this relationship, including managing Starmark-owned receivables, coordinating the purchase of new receivables, and overseeing Luther's servicing obligations. His role created a special relationship of trust and confidence that went beyond an ordinary contractual relationship, as Vasant assumed responsibility for processing payments, maintaining records, and providing access to financial information Starmark needed for regulatory compliance. This relationship created a reasonable expectation by Starmark that it could rely on Vasant's representations about Luther's financial operations.

46. Vasant breached his fiduciary duties to Starmark by:

   a. Misrepresenting that First Avenue was "no longer in the picture" when Luther was still pledging receivables to First Avenue;

   b. Directing Starmark to wire funds for receivables that had already been pledged

      to First Avenue without disclosing this material fact;

c. Failing to ensure that Starmark's funds were used to release any liens on the purchased receivables;

d. Participating in a scheme to defraud Starmark by double-pledging receivables;

e. Abandoning his responsibilities after receiving substantial funds from Starmark;

f. Participating in the commingling of Starmark's funds with Luther's general operating funds;

g. Failing to maintain accurate financial records and provide truthful account-level information as required under the servicing agreement;

h. Directing or permitting Luther to improperly withhold payments collected from accounts owned by Starmark;

i. Exploiting his control over Starmark's financial assets to benefit himself and Luther at Starmark's expense;

j. Violating the relationship of dependency whereby Starmark relied on Vasant for accurate financial reporting, proper handling of payments, and compliance with regulatory requirements; and

k. Deliberately exploiting the dependency relationship created by the servicing agreement to facilitate and conceal the fraudulent scheme, undermining Starmark's ability to comply with federal and state regulatory requirements.

47. As a direct and proximate result of Vasant's breaches of fiduciary duty, Starmark has suffered damages.

## COUNT II—FRAUD

48. Starmark incorporates by reference the allegations set forth in Paragraphs 1 through 42, as if set forth herein.

49. Vasant made false statements of material fact to Starmark, on which Starmark reasonably and justifiably relied, specifically:

   a. That First Avenue was "no longer in the picture" regarding Luther's receivables, a statement Vasant made during the January 17, 2024 in-person meeting despite knowing First Avenue maintained active liens on those same receivables;

   b. That Luther had exclusive ownership of the receivables offered to Starmark, which Vasant knew or should have known was false based on his access to Luther's internal financial records and his knowledge of the First Avenue-Luther relationship;

   c. That the funds Starmark wired would be properly applied to the purchase of unencumbered receivables, when Vasant knew that Luther intended to divert these funds to its operating account rather than clear existing liens;

   d. Omitting the material fact that Luther was in significant financial distress, information that Vasant possessed as a manager with financial oversight responsibilities; and

   e. That the documentation previously used for First Avenue funding would "now" be used for Starmark, falsely implying First Avenue would no longer provide funding to Luther.

50. Vasant knew these statements were false when he made them because:

   a. As Luther's designated relationship manager with Starmark since October 2023

      (and 12.6% owner of Luther) Vasant had access to and reviewed Luther's financial records showing the continuing relationship with First Avenue;

  b. Vasant personally sent emails regarding the documentation previously used to obtain funding from First Avenue, demonstrating his knowledge of the existing financing arrangements;

  c. Vasant participated in all material aspects of Luther's financial operations after October 20, 2023, including reviewing the monthly financial statements that would have revealed the double-pledging of receivables;

  d. Vasant knew Luther lacked the financial means to clear existing liens given its precarious financial position; and

  e. Vasant's presence on daily calls after Powers' death where fraud was openly discussed confirms his prior knowledge of the scheme.

51. Vasant made these false statements with the intent to induce Starmark to rely on them and wire substantial funds to Luther, evidenced by:

  a. The timing of his representations immediately preceding Starmark's three wire transfers;

  b. His repeated follow-up communications emphasizing wire instructions to ensure funds were sent;

  c. His deliberate concealment of Luther's ongoing relationship with First Avenue;

  d. His strategic choice to meet face-to-face on January 17, 2024 to make personal representations about First Avenue being "out of the picture"; and

  e. His abrupt cessation of all communications with Starmark immediately after securing the final wire transfer on February 22, 2024, demonstrating a

premeditated scheme to extract maximum funds before disappearing.

52. Starmark justifiably relied on Vasant's false statements because:

   a. Vasant occupied a position of trust as the designated manager of the Luther-Starmark relationship, creating a fiduciary relationship upon which Starmark reasonably depended;

   b. Starmark had no reasonable way to independently verify the status of Luther's relationship with First Avenue or the existence of liens on the receivables without Vasant's cooperation;

   c. Vasant's position as part-owner of Luther through his 9th Planet interest gave his representations added credibility;

   d. Luther's prior performance under the servicing agreement had established a pattern of trust upon which Starmark reasonably relied; and

   e. The specialized nature of the receivables servicing relationship created an information asymmetry that Vasant exploited, as Starmark depended on Luther for accurate financial reporting and account-level data.

53. As a direct and proximate result of Starmark's reliance on Vasant's fraudulent statements, Starmark has suffered damages.

54. The intentional nature of Vasant's fraud is further demonstrated by his actions following Powers' death, when he directed Luther to withhold both payments and financial data from Starmark, thus impeding Starmark's ability to mitigate damages and concealing evidence of the fraudulent scheme.

55. Vasant's conduct was intentional, willful, and malicious, warranting the imposition of punitive damages.

**RELIEF SOUGHT**

WHEREFORE, Starmark demands judgment on all Counts of this Complaint and an award of equitable relief and monetary relief against Defendant as follows:

a. An award of compensatory damages, plus pre- and post-judgment interest;

b. An award of punitive damages for Vasant's willful and malicious conduct;

c. An award of equitable restitution, plus pre- and post-judgment interest;

d. Entry of an order imposing a constructive trust over any funds or assets Vasant received from his fraudulent conduct;

e. An award of reasonable attorney's fees and costs; and

f. Any other relief the Court deems just and proper.

DATED: March 24, 2025

Respectfully submitted,

**GRANER & PLATZEK, P.A.**

By: \s\ Thomas U. Graner
Thomas U. Graner
Florida Bar No.: 905577
tom@granerlaw.com
Alexander K. Beg
Florida Bar No.: 1042019
alex@granerlaw.com
1699 S. Federal Highway
Boca Raton, Florida 33432
(561) 750-2445 Telephone
(561) 750-2446 Facsimile

*Attorneys for Plaintiff, Starmark Financial, LLC*